IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERRY COCHRELL, | No. C 11-3395 SI |
| Plaintiff, | **ORDER DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |
| v. | |
| BERKELEY UNIFIED SCHOOL DISTRICT, *et al.*, | |
| Defendants. | |

On December 9, 2011, the Court held a hearing on plaintiff's motion for a preliminary injunction. The Court has carefully considered the parties' arguments and declarations, and for the reasons set forth below, DENIES plaintiff's motion.

**BACKGROUND**

On July 11, 2011, plaintiff Terry Cochrell filed this lawsuit against the City of Berkeley ("the City") and the Berkeley Unified School District ("BUSD"). The complaint alleges that Cochrell is physically disabled and that he suffers from multiple disabling conditions, including but not limited to neuropathy,[1] and that he is required to use a motorized wheelchair for mobility. Compl. ¶ 1. The complaint states that plaintiff brings this action to require defendants to "make their 'warm swimming pool' and related facilities accessible to mobility-impaired disabled persons and provide their 'programs,

---

[1] In his declaration, plaintiff states that he has an autoimmune demylenating multifocal progressive polyneuropathy which affects his nervous system. Cochrell Decl. ¶ 2. Plaintiff states that his condition causes progressive nerve damage, and that as a result, his extremities are weakened and less sensitive to touch. *Id.*

services and activities' in a 'full and equal' non-discriminatory manner to persons with disabilities." *Id*. The complaint alleges that defendants have violated Title II of the Americans with Disabilities Act, the Rehabilitation Act of 1973, the California Unruh Civil Rights Act, and the California Disabled Persons Act.

On November 10, 2011, plaintiff filed a motion for a preliminary injunction seeking to enjoin the closure and demolition of the "Warm Pool." The Warm Pool is an indoor 30 feet by 25 yards pool that is heated to 92 degrees Fahrenheit, and it is located in a portion of the Old Gym Building on the Berkeley High School campus. The Warm Pool is scheduled to close on December 15, 2011, and the demolition is scheduled for 2012. The Old Gym is planned to be demolished as part of BUSD's South of Bancroft Master Plan for Berkeley High School ("SOBP"). The Old Gym was originally built in 1922. Jones Decl. ¶ 3. The Old Gym houses two indoor swimming pools: the Warm Pool, and another pool that was closed in 2004 due to safety issues. *Id*.

In or about January 2007, BUSD approved the SOBP, which consists of a phased building program to modernize the Berkeley High School campus and add classroom space and new athletic facilities. It is undisputed that as part of the SOBP, the Old Gym was evaluated and it was determined that the building did not meet seismic standards and should be demolished. BUSD has submitted copies of several structural analyses conducted on the Old Gym. Jones Decl. Ex. D-G. A December 18, 2001 seismic evaluation of the Old Gym states, "In summary, based upon our preliminary structural analysis and onsite visual observations of the building, we have determined that the Old Gym building will not provide the Life Safety level of seismic performance as stated by required by FEMA 356 seismic performance criteria." *Id*. Ex. G.[2]

---

[2] Plaintiff asserts that defendants' fear of seismic danger is overstated. However, plaintiff does not dispute that the Old Gym, including the portion of the building housing the Warm Pool, does not meet seismic safety standards, and that the Warm Pool poses some danger to public safety. *See* Pl's Reply to BUSD Opp'n at 7:16-18 ("Thus a close review of the seismic reports submitted as evidence shows that the pools building itself is not a danger to public safety *in the same degree* as the Gymnasium.") (emphasis added). In addition, plaintiff does not dispute that the stated reason for demolishing the Old Gym is because the building is seismically unsafe. The November 10, 2009 Berkeley Citywide Pools Master Plan, submitted by plaintiff, states, *inter alia*, "In June 2011, Berkeley Unified School District intends to demolish the seismically unsafe Berkeley High School Old Gym and the Warm Water Pool located within it in order to make room for much needed classrooms." McGuinness Decl. Ex. 4 at ES-1.

BUSD owns the Warm Pool, and the City leases the Warm Pool under a 1991 agreement with BUSD. The City currently offers a number of aquatics programs at the Warm Pool and two other pools in Berkeley, the King Pool and the West Campus Pool. The King and West Campus Pools are outdoor pools that are maintained at 80-81 degrees Fahrenheit.

A central dispute presented by this lawsuit and plaintiff's motion for preliminary injunction is the extent to which the City's aquatics programs are accessible to people with physical disabilities. Plaintiff contends that the Warm Pool is the City's only aquatics program serving disabled people, largely because of the pool's warm temperature and graduated depth. Plaintiff has submitted evidence, in the form of his own declaration and the declaration of Dori Maxon, P.T., showing that warm water is therapeutic for plaintiff and for many people with physical disabilities, and that cold water presents a barrier. Plaintiff states,

> 4. Now that I cannot walk, swimming is the only real exercise I can do. When I first began swimming for exercise, I could use "regular" pools with 83-88 degree water temperature because I was still strong enough to swim fast enough to keep warm and I had enough muscle and body fat to keep my body insulated. However, two conditions of my condition are muscle atrophy and weight loss. I am now skinny and need a water temperature of 92 degrees (like the Warm Pool) to swim in. Recently the Warm Pool temperature went down into the high 80's. As soon as I got in I could tell the difference. After swimming only one lap I was shivering and in deep discomfort. I had to get out of the water.
>
> 5. In regular pool temperatures I would have to move really fast just to keep warm, which would use up all my energy. In regular temperatures it becomes a struggle to keep afloat and moving. The cold becomes overwhelming and my body goes into shock. Hypothermia is a risk.
>
> 6. The Warm Pool also works for me because it is deep. Flotation is difficult for me because I am so skinny. Plus, I don't have much strength in my back so my legs sink down in the water. I could not use a shallow pool because my legs would drag on the bottom.
>
> 7. All my medical practitioners recommend swimming at the Warm Pool. They tell me exercise is essential to managing my condition. It is very hard to get full body exercise when I can't walk and have to use a wheelchair. Even my podiatrist recommended it to me.

Cochrell Decl. ¶¶ 4-7. Plaintiff states that if the Warm Pool closed, he would not have any other form of whole-body exercise available. *Id.* ¶ 13. Plaintiff also describes the positive results he experiences when he swims, *id.* ¶¶ 8-9, and the negative results when he has not been able to swim in the past:

> 14. Twice in the last few years I have gone a week without swimming. I noticed immediately that I began losing condition: My pulmonary circulation deteriorated, my

3

circulation through my kidneys slowed. Even going two days without swimming, I had increased pain. After a couple of days without exercise, my legs felt cold all the time even if I sat in front of a heater. After a week without swimming I was in very strong pain. I would fall down, I got sluggish, my attitude became lethargic and cynical. I didn't want to get out of bed.

*Id*. ¶ 14.

Plaintiff has also submitted the declaration of Dori Maxon, P.T.[3] Ms. Maxon states that she is an expert in aquatic therapy, specializing in pediatric rehabilitation and community based services. Maxon Decl. ¶ 1. Ms. Maxon is a licensed physical therapist. *Id*. Ms. Maxon is the founder and Executive Director of Special Needs Aquatic Program (SNAP), which is the only community-based aquatic motor development and adapted aquatics program serving children with special needs ages 1-18 in the East Bay. *Id*. ¶ 4. SNAP has been using the Warm Pool since 1992, serving as many as 55+ children per week. *Id*. In her declaration, Ms. Maxon states that there "is a substantial body of research demonstrating the benefits of warm water for rehabilitation, therapy and exercise." *Id*. ¶ 15. Ms. Maxon describes those benefits, *id*. ¶¶ 16-18, and she states that "[d]ue to its significant physiological benefits, warm water immersion provides physical fitness opportunities for people who have only limited movement abilities." *Id*. ¶ 19. Ms. Maxon elaborates,

> 20. Warm water, at 92 degrees, is essential to the populations who benefit from aquatic therapy, rehabilitation and exercise. People who have little physical movement need warm water to maintain their body temperature while decreasing pain, muscle guarding, improving flexibility, balancing and strength without fear of additional injury and/or falling. The warmth helps muscles relax, improves circulation and increases range of motion as patrons regain, maintain, and learn movement patterns, balance, and independence. Targeted populations include those with high tone, limited movement, limited body fat (e.g. from cerebral palsy), fibromyalgia, musculo-skeletal pain, shoulder/neck injuries, and a host of other orthopedic and neurological conditions.
>
> 21. When the water is too cool, the automatic nervous system reacts, causing chilling, shivering, distress, and tension. This defeats the potential benefits, limiting movement and inhibiting water's pain reduction properties. Cooler water also reduces the length of time these populations can remain in the water to get the benefits of conditioning and therapy. The cooler water temperatures is a disruption to the system and impairs the ability to meet rehabilitation and wellness goals. . . .

Maxon Decl. ¶¶ 20-21.

Plaintiff asserts that "the City admits that the Warm Pool is its only aquatics program serving

---

[3] BUSD raises various objections to Ms. Maxon's declaration. The Court overrules defendant's objections to the portions of Ms. Maxon's declaration cited in this order. The Court does not rule on the parties' other evidentiary objections because this order does not rely on the evidence at issue.

4

1 disabled people." Motion at 13:28-14:1. For support, plaintiff cites a memo from Berkeley City
2 Manager Phil Kamlarz to the Berkeley Mayor and City Council recommending the adoption of a
3 resolution authorizing the City Manager to execute a contract and any amendments with an architectural
4 firm to provide architectural and engineering services for the preliminary design and cost estimating for
5 a new Warm Water Pool. That memo states that the Warm Water Pool is scheduled to be demolished,
6 and "[i]f and when this building is demolished, the City will no longer have access to a therapeutic
7 warm water pool for senior and disabled residents of the City." McGuinness Decl. Ex. 3 at COB0531.
8 The memo also states that the Warm Water Pool "is currently used by the City of Berkeley to provide
9 various recreational and therapeutic programs for seniors and disabled residents of the City." *Id*. The
10 City argues this document does not constitute an admission that the Warm Pool is the City's only
11 aquatics program, and the Court agrees. A statement that the City will no longer have access to a
12 therapeutic warm pool for senior and disabled residents is not equivalent to stating that the Warm Pool
13 is the City's only aquatics program serving disabled people.

14 Plaintiff does not explicitly state what constitutes the aquatics program serving disabled people,
15 except to assert that this program is only offered at the Warm Pool. However, in plaintiff's reply to the
16 City's opposition, plaintiff proposes one possible alternative to the Warm Pool (the Berkeley YMCA,
17 discussed in greater detail *infra*), and states that the Berkeley YMCA would only be a viable option, if,
18 *inter alia*, the City were required to offer the following programs at the Berkeley YMCA: Quiet Swim,
19 Senior/Disabled Swim, Arthritis Class, and Aqua Chi. All of these classes are currently offered only
20 at the Warm Pool. *See* Ferris Decl. Ex. A ( "Fall & Holiday Activity Guide" for 2011, at 19-20).

21 The City asserts that it offers a number of structured and unstructured aquatics programs at the
22 Warm Pool, King Pool, and West Campus Pool, "including a series of programs for seniors and disabled
23 swimmers at each pool." City's Opp'n at 1:26-28. For support, the City cites the 2011 Fall and
24 Holiday Activity Guide, which shows that "Senior Exercise" is offered at both King and West Campus
25 Pools. The City states that both the King and West Campus Pools are ADA-compliant, accessible to
26 users with mobility impairments, and are equipped with hydraulic swim lifts to assist patrons in
27 wheelchairs. Ferris Decl. ¶ 7. According to the further declaration of Frederick Scott Ferris, the
28 Recreation and Youth Services Manager for the City of Berkeley's Parks, Recreation & Waterfront

5

Department, upon the closure of the Warm Pool, the City intends to offer aquatics programs for disabled and senior patrons at King and West Campus Pools. Mr. Ferris states that the City currently runs the following programs exclusively for senior or disabled patrons at the Warm Pool:

- Arthritis Class, currently held at the Warm Pool for 1 hour per week. Mr. Ferris states that upon closure of the Warm Pool, "the City will encourage patrons to participate in a similar class at King Pool, the somewhat misnamed 'Senior Exercise Class.' In reality, the current 'Senior Exercise Class' enrollment is approximately 60% disabled patrons, and not all of them are seniors. The City plans to rename the class to the more accurate 'Senior/Disabled Exercise Class." The Senior/Disabled Exercise class will be available four hours per week . . . The class is held in the shallow end of the pool, where the patrons can stand." Supp. Ferris Decl. ¶ 3.

- Quiet Swim, currently held at Warm Pool for 6 hours per week. Mr. Ferris states that Quiet Swim "is not a staff-led class, it is a 'drop-in' program costing $3 for senior/disabled patrons. 'Quiet Swim' is simply a way to utilize the deep end of the pool while an instructor-led class occupies the shallow end. The pool area is not 'quiet,' instead those that are in the deep end must remain quiet so they don't disturb the class going on in the shallow end. Upon closure of Warm Pool, the City intends to open the diving pool at King Pool for this same purpose for approximately 6 hours per week, as the diving pool is a completely separate deep pool (minimum 10.5 feet deep) approximately 35' x 30,' which is roughly the same space available at Warm Pool in the deep end. Those patrons would be charged the drop-in fee of $3 per visit." *Id*.

- Senior/Disabled Swim, currently held at Warm Pool for 13 hours per week. Mr. Ferris states that this is a drop-in class, not a staff-led class. "For Senior/Disabled Swim, Warm Pool is divided into two sections, allowing for lap swim in the deep end and standing-related activities in the shallow end. Upon closure of Warm Pool, those patrons can utilize King Pool for lap swim (up to 35 hours per week) and the shallow part of King Pool will be available for many hours as well for those patrons who presently enjoy activities in the shallow end of Warm Pool." *Id*. Patrons will be charged the $3 drop-in

6

1                         fee.

2         •      Spirit Walking/Aqua Chi, currently held in the shallow end of Warm Pool for 2 hours per week. This is a "fee class" costing $5 for senior and disabled patrons. Mr. Ferris states that upon closure of the Warm Pool, "the City intends to offer a 'meditation' class in the shallow end of the King Pool." *Id.*

Both defendants also assert that plaintiff has access to two other warm pools just one block from the Warm Pool – the Berkeley YMCA. The Berkeley YMCA has three pools, of which two are maintained at warmer temperatures. One is kept at 88-90 degrees Fahrenheit, has 3 lanes, and is 3 feet 6 inches at its shallowest end and 7 feet in the deep end. Ferris Decl. Ex. B.[4] The other is heated to 90-92 degrees Fahrenheit, measures 30 feet square and is 3 feet to 3 feet 2 inches deep. *Id.* Both pools are equipped with lifts to enable physical access to the pool for swimmers in wheelchairs. At the hearing on this motion, plaintiff asserted that the Berkeley YMCA is not currently a viable option[5] because plaintiff requires both a larger pool with graduated depth and water heated to 92 degrees. Plaintiff contends that the Berkeley YMCA could be an adequate alternative to the Warm Pool if the Court ordered the City to enter into an agreement with the Berkeley YMCA requiring that the larger graduated depth pool be heated to 92 degrees (instead of 88-90 degrees).

Plaintiff seeks a preliminary injunction ordering defendants to keep the Warm Pool open until the resolution of this case or until defendants provide an adequate alternative to the Warm Pool. Defendants contend that closure of the Warm Pool will not deny plaintiff access to City aquatics programs, and that the balance of equities tip strongly in favor of defendants due to the safety issues with the Old Gym.

---

[4] It is this larger pool that plaintiff asserts could be made an alternative if the temperature was increased to 90-92 and if the City transferred the disabled swim programs, among other things.

[5] Plaintiff also contends that Court cannot consider the existence of a private warm pool that is accessible to the public in its consideration of plaintiff's claims that defendants are in violation of their obligation to provide access to public services. The Court agrees. However, as discussed *infra*, the Court finds that the availability of the Berkeley YMCA warm pools is relevant to the Court's analysis of whether the balance of equities favors the issuance of an injunction.

7

## LEGAL STANDARD

The standard test for preliminary injunctive relief requires establishment of four factors by a preponderance of the evidence: (1) likelihood of success on the merits; (2) likelihood the moving party will suffer irreparable harm absent injunctive relief; (3) that the balance of equities tips in the moving parties' favor; and (4) that an injunction is in the public interest. *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008). The Court in *Winter* clarified that plaintiffs must establish that "irreparable harm is likely, not just possible, in order to obtain a preliminary injunction." *Alliance For the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). A preliminary injunction is an extraordinary remedy, never awarded as of right. *Winter*, 555 U.S. at 9.

The Ninth Circuit has held that the "serious questions" test for issuing a preliminary injunction survived *Winter*. "That is, 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies*, 632 F.3d at 1135. Plaintiff contends that he has met the "serious questions" test for issuance of a preliminary injunction.

## DISCUSSION

The complaint alleges that defendants have violated Title II of the Americans with Disabilities Act, the Rehabilitation Act of 1973, the California Unruh Civil Rights Act, and the California Disabled Persons Act. The elements of these claims are all very similar, and the parties' briefing largely addresses plaintiff's claims under the rubric of the ADA and cases interpreting "programmatic access" under Title II. Accordingly, the Court will do the same.

Title II of the ADA provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. To establish a violation of Title II of the ADA, a plaintiff must show that (1) he is a qualified individual with a disability; (2) he was excluded from participation in or otherwise

8

discriminated against with regard to a public entity's services, programs, or activities, and (3) such exclusion or discrimination was by reason of his disability. *See Weinreich v. Los Angeles County Metro. Transp. Auth*., 114 F.3d 976, 978 (9th Cir.1997). In *Crowder v. Kitigawa*, 81 F.3d 1480 (9th Cir. 1996), the Ninth Circuit held that Title II prohibits both intentional discrimination against people with disabilities, "as well as those forms of discrimination which deny disabled persons public services disproportionately due to their disability." *Id*. at 1483.

Federal regulations provide that public entities must "operate each service, program, and activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a). This regulation, titled "Program Accessibility," provides in relevant part:

> (a) General. A public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities. This paragraph does not–
>
> > (1) Necessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities;
> >
> > (2) Require a public entity to take any action that would threaten or destroy the historic significance of an historic property; or
> >
> > (3) Require a public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens. In those circumstances where personnel of the public entity believe that the proposed action would fundamentally alter the service, program, or activity or would result in undue financial and administrative burdens, a public entity has the burden of proving that compliance with § 35.150(a) of this part would result in such alteration or burdens. The decision that compliance would result in such alteration or burdens must be made by the head of a public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity, and must be accompanied by a written statement of the reasons for reaching that conclusion. If an action would result in such an alteration or such burdens, a public entity shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that individuals with disabilities receive the benefits or services provided by the public entity.
>
> (b) Methods–
>
> > (1) General. A public entity may comply with the requirements of this section through such means as redesign or acquisition of equipment, reassignment of services to accessible buildings, assignment of aides to beneficiaries, home visits, delivery of services at alternate accessible sites, alteration of existing facilities and construction of new facilities,

> use of accessible rolling stock or other conveyances, or any other methods that result in making its services, programs, or activities readily accessible to and usable by individuals with disabilities. A public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance with this section. A public entity, in making alterations to existing buildings, shall meet the accessibility requirements of § 35.151. In choosing among available methods for meeting the requirements of this section, a public entity shall give priority to those methods that offer services, programs, and activities to qualified individuals with disabilities in the most integrated setting appropriate.

28 C.F.R. § 35.150(a)-(b).

Plaintiff contends that the closure of the Warm Pool will deny him meaningful access to the City's aquatic programs. Plaintiff relies on several cases in which courts have granted injunctions to enjoin the closure of public programs serving the disabled because there were no equivalent programs available to fill the void left by the closure. In *Rodde v. Bonta*, 357 F.3d 988 (9th Cir. 2004), the Ninth Circuit upheld a preliminary injunction prohibiting Los Angeles County from closing a county hospital "dedicated primarily to providing inpatient and outpatient rehabilitative care to disabled individuals." *Id*. at 989. The plaintiffs were patients with special needs who required medical services that were only offered at the hospital. The County argued that the closure was a necessary cost-saving measure, and argued that the hospital's closure was not discriminatory because the proposed cuts were facially neutral and "'across-the-board' because it also plans to reduce the beds at County-USC Hospital (and already has eliminated some clinics)." *Id*. at 997. The County asserted that the proposed closure was similar to the cuts upheld by the Supreme Court in *Alexander v. Choate*, 469 U.S. 289 (1985).[6]

The Ninth Circuit rejected the County's argument,

> Reductions analogous to the cut in *Alexander* might include eliminating X dollars or Y percent of funding from the budget of each of the County's six hospitals or from each medical department or type of service offered therein. Eliminating entirely the only hospital of six that focuses on the needs of disabled individuals (because the County

---

[6] In *Alexander*, Tennessee proposed reducing the number of annual days of inpatient care covered by the state Medicaid program from 20 to 14 for all program participants. The plaintiffs challenged the proposed cuts as discriminatory in violation of the Rehabilitation Act because it would have a disproportionate impact on the disabled. The Supreme Court held that the planned reduction was not discriminatory because the proposed cuts left all patients "with identical and effective hospital services fully available for their use, with both classes of users subject to the same durational limitation." *Alexander*, 469 U.S. at 302. The Court also noted that nothing in the record suggested "that the illnesses uniquely associated with the handicapped or occurring with greater frequency among them cannot be effectively treated, at least in part, with fewer than 14 days' coverage." *Id*. at 302 n.22.

10

> earlier decided to consolidate such services at that hospital) and that provides services disproportionately required by the disabled and available nowhere else in the County is simply not the sort of facially neutral reduction considered in *Alexander*. *Alexander* may allow the County to step down services equally for all who rely on it for their healthcare needs, but it does not sanction the wholesale elimination of services relied upon disproportionately by the disabled because of their disabilities.

*Rodde*, 357 F.3d at 997.

The *Rodde* court relied in part on *Concerned Parents to Save Dreher Park Center v. City of West Palm Beach*, 846 F. Supp. 986 (S.D. Fla. 1994), which plaintiff also relies upon. In *Concerned Parents*, the City of West Palm Beach had conducted a needs assessment to determine the need for leisure services for people with physical and mental disabilities in the city. The city determined that there was a significant need for such services, and as a result, provided a variety of recreational and social programs for people with disabilities at Dreher Park Center. *Id*. at 988. As a result of budget constraints, the city planned to close Dreher Park Center, thus completely eliminating all recreational programs for people with disabilities. *Id*. at 989. The district court enjoined the closure of the center, finding that "the elimination of the Dreher Park Center programs has the effect of denying persons with disabilities the benefits of the City's recreational programs" because there were no equivalent programs provided elsewhere. *Id*. at 991.

Defendants contend that this case is distinguishable from *Rodde* and *Concerned Parents* because after the closure of the Warm Pool, aquatics programs for people with disabilities will continue to be offered by the City at pools that meet ADA accessibility design guidelines.[7] The Court agrees that this is a critical difference between those cases and the instant one. In *Rodde* and *Concerned Parents*, it was undisputed that the closure of the hospital and recreation center would completely eliminate services and programs for people with disabilities. Here, as stated in the further declaration of Mr. Ferris, aquatics programs for people with disabilities will be offered at the King and West Campus Pools after the closure of the Warm Pool.

---

[7] Defendants also raise a number of other challenges to plaintiff's claims. Both defendants assert that they have no information as to whether plaintiff is a "qualified individual with a disability" under the law, and BUSD argues that it only leases the Warm Pool to the City and that BUSD does not itself provide any aquatics programs, services or activities to the public. The Court finds it unnecessary to resolve these questions at this time because the Court finds that even though plaintiff has raised serious questions on the merits of his claims, the balance of equities does not tip sharply in his favor.

11

The Court finds that while plaintiff has raised serious questions going to the merits of his claims, plaintiff has not shown by a preponderance of the evidence that he is likely to succeed. Plaintiff contends that the disabled swim programs at King and West Campus Pools will be inaccessible to him because he requires 92 degree water in a graduated depth pool in order to access the City's aquatics programs, and he argues that these are reasonable modifications that the City should be required to provide. However, as the City notes, ADA accessibility design guidelines do not mandate any particular temperature for pools, and the City argues, with some force, that if the Court granted plaintiff the injunctive relief he seeks – a 92 degree graduated depth pool – the Court would essentially be mandating a new access requirement for any public entity that provides an aquatics program. The City also states that it attempts to keep the Warm Pool between 91 and 93 degrees, ideally at 92 degrees, and that even when the temperature is at that range, the City receives frequent complaints from disabled users who want the temperature of the water and the facility to be either lower or higher. Ferris Decl. ¶ 9. Thus, the temperature and conditions that plaintiff may require may not be the same temperature and conditions that other disabled people require for access. On this record, the Court finds that there are serious questions as to whether maintaining a warm pool heated to 92 degrees is a reasonable modification necessary to provide program access.

Under the "serious questions" test, plaintiff must also show that the balance of equities tips sharply in his favor. The Court concludes that plaintiff has not made this showing because of the seismic safety issues that have been identified at the Old Gym (and the portion housing the Warm Pool), and the potential hazard posed by that building to students, City and BUSD employees, and the public in the event of an earthquake. While plaintiff asserts that defendants are overstating the structural deficiencies of the Old Gym, it is undisputed that a number of structural evaluations of the Old Gym have found that the Old Gym, including the portion housing the Warm Pool, does not meet seismic safety standards. The record before the Court shows that if there was a significant earthquake in the Bay Area, the Old Gym would likely collapse. The Old Gym is located approximately one mile from the Hayward fault and 17 miles from the San Andreas fault. Keil Decl. at 5:9-10. Defendants have submitted evidence, undisputed by plaintiff, that the Uniform California Earthquake Rupture Forecast, Version 2 (United States Geological Survey, 2008), estimates the possibility of a magnitude 6.7 or

12

greater earthquake to occur in the next 30 years on the Hayward fault to be 31% and on the San Andreas fault to be 21%. *Id.* at 5:10-13. At the hearing, plaintiff's counsel argued that the chances of a major earthquake were small, and counsel stated that plaintiff is willing to accept that small risk in order to continue using the Warm Pool. However, given the risk to public safety in the event of an earthquake, the Court concludes that the requested injunction is not in the public interest.

In evaluating the balance of the equities, the Court also finds that the availability of the Berkeley YMCA warm pools weighs in favor of denying the injunction. The record before the Court shows that the Berkeley YMCA is located one block from the Warm Pool, and has two warm pools (one larger graduated depth pool heated to 88-90 degrees Fahrenheit, and one smaller shallow pool heated to 90-92 degrees Fahrenheit). Ferris Decl. ¶ 4; Further Ferris Decl. ¶ 5 & Ex. A. On December 2, 2011, the Berkeley YMCA sent a letter to Warm Pool users it had identified, offering users a free one-month guest pass. *Id.* Ex. A. The letter also states that the YMCA "will be offering streamlined financial assistance to city warm pool users, who may not be able to afford the full membership." *Id.*[8] Although the YMCA warm pools are not identical to the Warm Pool in configuration and temperature, they do provide an alternative warm swimming option to plaintiff.

## CONCLUSION

For the foregoing reasons, the Court DENIES plaintiff's motion for a preliminary injunction. Docket Nos. 15 and 16.

**IT IS SO ORDERED.**

Dated: December 19, 2011

SUSAN ILLSTON
United States District Judge

---

[8] The current monthly membership at the Berkeley YMCA is $62/month, while the monthly pass at the Warm Pool is $37 for people with disabilities. Ferris Decl. ¶¶ 3, 8. Mr. Ferris states that beginning in September 2011, he participated in several meetings, site visits and discussions with management at the Berkeley YMCA to learn about the Berkeley YMCA and to assist current users of the Warm Pool after the Warm Pool closes. *Id.* ¶ 8. Mr. Ferris states that "many members [of the YMCA] receive financial assistance based on demonstrated financial need, often resulting in a monthly fee of $40 or less." *Id.*